IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES A. ZEIDLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 03 C 5063 |
| | ) |
| A&W RESTAURANTS, INC., | ) Wayne R. Andersen |
| | ) District Judge |
| Defendant. | ) |
| | ) |

## MEMORANDUM, OPINION AND ORDER

This matter is before the court on the parties' cross-motions for summary judgment. Plaintiff James Zeidler ("Zeidler") filed this lawsuit against defendant A&W Restaurants, Inc. ("A&W") for violations of the Illinois Franchise Disclosure Act, breach and wrongful termination of the parties' License Agreement, and fraud. For the reasons stated below, A&W Restaurants, Inc.'s motion for summary judgment [75] is granted, and James Zeidler's cross-motion for summary judgment [93] is denied.

## BACKGROUND

The following facts are taken from the parties' statements of undisputed facts. On June 18, 1996, after Zeidler showed interest in opening and operating an A&W franchise, A&W sent Zeidler an A&W Uniform Franchise Offering Circular ("Offering Circular"). The Offering Circular provided Zeidler with a description of A&W's operations and procedures. On July 9, 1996, Zeidler entered into a written License Agreement (the "Agreement") with A&W, which provided, among other things, that Zeidler would open an A&W franchise at 1156 East Irving Park Road in Streamwood, Illinois (the "Restaurant").

On November 27, 1996, A&W sent Zeidler a letter advising him that A&W had learned that a Diary Queen was scheduled to open next door to Zeidler's Restaurant. A&W noted that this opening would increase competition and decrease the viability of the Restaurant. A&W stated that it would not have approved the location Zeidler had chosen for the Restaurant had it known of the proposed Dairy Queen. A&W asked Zeidler to reconsider his decision to develop the Restaurant and explained that abandoning the project at that point would minimize losses. A&W also advised Zeidler that it was prepared to refund all of the money he had invested to date.

Despite A&W's warning, Zeidler opened the Restaurant on March 18, 1997. The Restaurant never showed a profit, and its operations started to decline soon after opening. Over the next several months, A&W sent several letters to Zeidler advising him that the Restaurant was not meeting A&W's standards for customer service and cleanliness. On September 25, 1998, Zeidler advised A&W that he intended to either sell, lease or close his franchise because the Restaurant was losing significant amounts of money. On November 2, 1998, Zeidler sent a letter to A&W asking permission to close his Restaurant for the winter due to poor sales. Section 3.1 of the License Agreement governs the number of days that an A&W franchise must be open each year and requires that a restaurant must be open for at least three hundred sixty days each year. Notwithstanding the terms of the Agreement, A&W agreed, and Zeidler closed the Restaurant and reopened in March 1999.

On September 10, 1999, Zeidler again requested permission to close the Restaurant for the fall and winter months and proposed a reopen date of March 15, 2000. In letter dated a September 28, 1999, A&W agreed and notified Zeidler that for one year only Section 3.1 of the

2

License Agreement would not be enforced. Zeidler closed the Restaurant in September 1999 and never reopened. Zeidler admitted during a deposition that he began attempting to sell the Restaurant property about one week after it was closed.

A&W received a letter from Zeidler on April 28, 2000 in which he explained that it would be impossible for him to reopen the Restaurant. In a letter dated May 4, 2000, A&W sought further explanation as to why Zeidler would not reopen the Restaurant and also informed him that his failure to reopen the Restaurant placed him in material breach of the License Agreement. Zeidler responded on May 16, 2000 and explained that he would not reopen the Restaurant because he could no longer subsidize it, and he inquired about whether A&W was interested in acquiring the Restaurant. On June 8, 2000, A&W advised Zeidler that it was not interested in purchasing the Restaurant and also reminded him that his continued failure to operate the Restaurant placed him in material breach of Section 3.1.

On March 5, 2001, Zeidler requested A&W to provide him with a franchise mailing list. Zeidler wanted to send out a questionnaire to all A&W franchisees to determine what, if any, updates and revisions they received from A&W. A&W refused to provide the mailing lists. At that time, A&W also acknowledged Zeidler's abandonment of the Restaurant and stated that it expressly reserved all rights and claims it may have with respect to his abandonment of the Restaurant. Section 17 of the License Agreement provides, in part, that "[t]he Company shall have the right to terminate this Agreement upon written notice to the Licensee in the event . . . the Licensee ceases to operate the Restaurant, or otherwise abandons the Restaurant." (Def.'s Rule 56.1 Statement of Facts, ¶ 12). As of March 15, 2001, the Restaurant had been closed for more than 550 consecutive days.

3

On March 14, 2002, A&W's former Chief Executive Officer, Sidney Feltenstein, delivered a speech that was webcast over the Internet. In his remarks, Feltenstein stated that in 1994, when he and his partners "bought the company, we realized we could not build free-standing buildings on corners – the unit economics simply wouldn't justify that." (Pl.'s Rule 56.1 Statement of Facts, ¶ 15).

On July 23, 2003, Zeidler filed a two-count complaint against A&W, alleging that A&W violated the Illinois Franchise Disclosure Act and breached the License Agreement. On November 5, 2003, Zeidler filed his first amended complaint and added additional counts for wrongful termination, breach of contract and fraud.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The court considers the evidence in a light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Anderson*, 477 U.S. at 255. Nevertheless, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine

4

issue for trial." FED. R. CIV. P. 56(e). A party must present "more than a scintilla of evidence" to defeat summary judgment. *Senner*, 113 F.3d at 757.

Indeed, "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of DuPage*, 715 F.2d 1238, 1243 (7th Cir. 1983). Conclusory allegations alone will not defeat a motion for summary judgment. *See Thomas v. Christ Hosp. and Medical Center*, 328 F.3d 890, 893- 94 (7th Cir. 2003), citing *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888-89 (1990). "Speculation does not create a *genuine* issue of fact, instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (emphasis added).

Local Rule 56.1 for the Northern District of Illinois requires that the parties support all facts with specific references to the record and further emphasizes that it is inappropriate to include legal conclusions and/or argument in the Rule 56.1 statements of facts. *See Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 871 (7th Cir. 2000) (all relevant facts denied without supporting documentation must be accepted as true provided the facts are "properly supported by references to the record or other evidentiary materials"). The Seventh Circuit repeatedly has sustained the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the local rules and regularly upholds strict enforcement of Rule 56.1. *See Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (citing cases).

5

In this case, Zeidler's Rule 56.1 statement of facts and responses to A&W's statement of facts (1) include unsupported facts, (2) set forth legal argument as opposed to fact, (3) attach documents that are not authenticated and (4) contradict his prior deposition testimony and allegations in the complaint. In addition, Zeidler did not submit any declaration or affidavit attesting to any of the additional facts in his response and memorandum of law. Because Zeidler has failed to comply with Local Rule 56.1, the court adopts A&W's Rule 56.1 statement of facts in deciding the summary judgment motions. However, it should be noted that this court has reviewed and studied all of the materials submitted by Zeidler and, when appropriate, has taken into consideration the materials he has submitted to the court.

## I. Zeidler's Abandonment of His Franchise Bars His Claim that A&W Wrongfully Terminated His Franchise

Count I asserts that A&W's March 15, 2001 letter, which acknowledged Zeidler's abandonment of his franchise, in effect terminated the License Agreement in violation of the Illinois Franchise Disclosure Act ("IFDA"), 815 ILCS 705/19 (2005). As a threshold matter, the court questions whether A&W, in fact, has effectuated termination of the License Agreement. Following Zeidler's permanent closure of the Restaurant, A&W corresponded with Zeidler several times. Each letter discussed the implications of the Restaurant's closure on the License Agreement and acknowledged that Zeidler's failure to reopen the Restaurant in March 2000 constituted material breach of his obligations under the License Agreement. The court has no doubt that A&W had the authority to terminate the Agreement with written notice at any time after Zeidler failed to reopen. Yet, based on the record before this court, it is not clear that A&W has ever provided Zeidler with an actual notice of termination.

Nevertheless, even assuming that A&W did effectuate a termination of the License Agreement, it is undisputed that Zeidler ceased operating the Restaurant long before A&W acknowledged the abandonment of his franchise. To the extent that A&W's March 15, 2001 letter could be deemed to have effectuated termination of the Agreement, A&W had good cause to do so. The IFDA provides that a franchise may be terminated prior to the expiration of its term for "good cause" and that good cause "shall include . . . situations in which the franchisee . . . voluntarily abandons the franchise business." 815 ILCS 705/1999©).

Against a similar factual backdrop, Zeidler's brother, Russell filed a lawsuit against A&W in 2000. *See Russell Zeidler v. A&W Restaurants, Inc.*, 301 F.3d 572 (7th Cir. 2002); 2001 WL 62571 (N.D. Ill. Jan. 25, 2001). Russell opened an A&W franchise in 1993. *Russell Zeidler*, 2001 WL 62571, at *1. By 1997, the restaurant had failed, and Russell's relationship with A&W soured. *Id.* at *2. In 1998, A&W sent several letters to Russell threatening to terminate his license agreement because the restaurant was not being operated according to A&W's standards. *Id.* at *3. On March 13, 1999, Russell closed his restaurant and removed the equipment. On March 25, 1999, A&W sent Russell a letter formally terminating his franchise. *Id.*

Thereafter, Russell filed suit against A&W and claimed wrongful termination in breach the license agreement and in violation of the IFDA. The district court granted A&W's motion for summary judgment and denied Russell's cross-motion for partial summary judgment, concluding that A&W lawfully terminated the agreement. *Id.* at *6. The Seventh Circuit affirmed, finding that a franchisee who abandons his franchise by closing it during the term of the license agreement may not bring an action for wrongful termination against the franchisor. *See Russell Zeidler*, 301 F.3d at 574 (citing *Moro v. Shell Oil Co.*, 91 F.3d 872, 875 (7th Cir. 1996)).

7

Russell's abandonment of his restaurant also doomed his IFDA claim because the statute specifically recognizes voluntary abandonment as "good cause" for a franchisor to terminate a license agreement. *Id.*

The Seventh Circuit's holding in *Russell Zeidler v. A&W* is dispositive. At the commencement of this lawsuit, James Zeidler's Restaurant had been closed for over 550 consecutive days. Zeidler never made known any intention to reopen and admitted in his deposition that he had attempted to sell the Restaurant soon after it closed. The lengthy closure by Zeidler amounts to legal abandonment of the Restaurant, and his abandonment of the Restaurant bars any claims Zeidler may have for wrongful termination. *See Russell Zeidler*, 301 F.3d at 574; *Moro*, 91 F.3d at 875.

## II. Zeidler's Claim for Breach of the License Agreement Is Legally and Factually Insufficient

Count II of the amended complaint alleges that A&W breached the License Agreement by failing to communicate and cooperate with Zeidler when he attempted to obtain information that allegedly was necessary for him to reopen the Restaurant in April 2001. In furtherance of his claim, Zeidler describes an atmosphere in which A&W refused to communicate with him, and he claims that no one at A&W would return his phone calls. Zeidler also alleges that his request for a two volume CD-rom manual containing operating standards necessary to reopen went unanswered, and as a result, he was unable to reopen the Restaurant.

The substance of Zeidler's evidence supporting his alleged attempts to contact A&W is scant. Zeidler's evidence is largely comprised of bare allegations within his amended complaint and unsupported conclusions contained within his summary judgment materials. When asked to

submit proof of his attempts to communicate with A&W, Zeidler submitted phone records from December 2000 through March 2001. However, the phone records reveal only a few attempts made by Zeidler to communicate with A&W. These attempts do not rise to a level of unresponsiveness that would prevent Zeidler from reopening. Nor do they reveal any intent on the part of A&W to forestall the reopening of the Restaurant.

The traditional rule in Illinois is that a party is prevented from bringing a claim for breach of contract in the absence of "alleging and proving that he has himself substantially complied with all the material terms of the agreement." *George Mueller & Sons, Inc. v. N. Ill. Gas Co.*, 32 Ill. App. 3d 249, 254 1st Dist. 1975). More recent jurisprudence puts a slightly different spin on this rule, stating that, "only a material breach of a contract provision will justify non-performance by the other party." *Israel ex rel. Dundee-Landwehr Ltd. P'ship v. Nat'l Can. Corp.*, 276 Ill. App. 3d 454, 460 (1st Dist. 1995).

In this case, on the day Zeidler alleges he first attempted to contact A&W to express his intent to reopen, the Restaurant already had been closed for nearly one year. Zeidler's failure to reopen the Restaurant in March 2000 was a material breach of the License Agreement. *See Russell Zeidler*, 301 F.3d at 574. As a result, even if A&W did have a duty to disclose the mailing lists, its non-performance is justified by Zeidler's material breach. Since Zeidler cannot prove that he complied with the terms of the License Agreement, he cannot sustain a claim for breach.

9

## III. Zeidler's Claims of Fraud in Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act Are Legally Insufficient

Count III of the amended complaint claims that A&W violated the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Consumer Fraud Act"), 815 ILCS 505/2 (2005), by failing to disclose material information before Zeidler signed the License Agreement. Zeidler points to a statement made by Sidney Feltenstein, the former CEO of A&W. Specifically, Mr. Feltenstein delivered a speech on March 14, 2002 at an investor relations meeting. In his remarks, Feltenstein, while discussing his acquisition of A&W Restaurants, Inc. in 1994, stated that when he and his business partners "bought the company, we realized we could not build free-standing buildings on corners - the unit economics simply wouldn't justify that." (Pl.'s Rule 56.1 Statement of Facts, ¶ 15). Zeidler contends that had he known this, he would not have invested in an A&W franchise.

Pursuant to the Consumer Fraud Act, "[a]ny person who suffers actual damages as a result of a violation of [the] Act committed by any other person may bring an action against such person." 815 ILCS 505/10a(a) (2005). To state claim for a violation of the Consumer Fraud Act, a plaintiff much establish: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, (4) actual damage to the plaintiff (5) that is proximately caused by the deception. *See Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149 (2002).

The case of *Olympic Chevrolet, Inc. v. General Motors* is instructive on this issue. 959 F. Supp. 918 (N.D. Ill. 1997). In *Olympic Chevrolet*, the plaintiff entered into a Dealer Sales and Service Agreement with the defendant. *Id.* at 920. Unhappy with the vehicles it received from the

defendant, the plaintiff filed a lawsuit pursuing a number of claims, including a claim alleging violations of the Consumer Fraud Act. *Id.* The plaintiff claimed that it entered into the Dealer Agreement because of various misrepresentations made by the defendant. *Id.* However, it was revealed in discovery that the defendant had resisted granting the franchise because the location of the plaintiff's dealership was in close proximity to another dealership, and the defendant believed that the plaintiff's dealership would be unprofitable. *Id.* at 921. The defendant signed the Dealer Agreement only after the plaintiff successfully obtained a court order forcing it to do so. *Id.* The defendant moved for summary judgment on the Consumer Fraud Act claim because of the nature in which the agreement was entered into. *Id.* The court granted summary judgment to the defendant, concluding that a reasonable factfinder could not conclude that the defendant fraudulently intended the plaintiff to rely on any misrepresentations because it was made clear that the defendant did not want to enter into a relationship with the plaintiff. *Id.*

Zeidler contends that he would not have invested in an A&W franchise if Feltenstein's realization had been disclosed before Zeidler signed the License Agreement. Zeidler's argument is belied by the facts. On November 27, 1996, A&W sent Zeidler a letter advising him that A&W had just learned that a Diary Queen was opening next door to Zeidler's Restaurant. A&W explained that this development would increase competition and decrease the viability of Zeidler's Restaurant. A&W further stated that it would not have approved Zeidler's Restaurant location had it known of the Dairy Queen. A&W suggested that Zeidler not open his Restaurant as it would likely be an unprofitable venture. A&W also offered to refund all money paid up to that point and cancel Zeidler's equipment order.

A&W's letter, which was sent four months before the Restaurant opened, urged Zeidler not to open because increased competition would likely prevent Zeidler from realizing any profits. Feltenstein's remarks, which came almost six years after Zeidler opened the Restaurant, suggested that no free-standing A&W Restaurant would be profitable. Both statements have the same message – Zeidler's Restaurant likely would not be profitable. These facts all support the conclusion that Zeidler did not suffer an injury proximately caused by any alleged deception of A&W. A&W's straightforward, clear message that the Restaurant would be facing an uphill battle to profitability undermines Zeidler's attempts to show that A&W intended to fraudulently induce Zeidler to open the Restaurant. Zeidler cannot claim ignorance just because he chose to ignore the warning. A&W disclosed the business risks in opening the Restaurant. Aware of these risks, Zeidler nevertheless decided to proceed and opened the Restaurant.

The timing of Feltenstein's statement provides further support for A&W. The statement was not made before the parties entered into the License Agreement. Rather, the statement was made in 2002, nearly six years after the Agreement was signed. The statement referred to an understanding A&W's former CEO and his business partners had in 1994. Zeidler is unable to point to any statement made before he signed the License Agreement that would have altered his course of action. When Zeidler was given the unencumbered opportunity to withdraw from his business deal with A&W after learning that there was a significant chance the venture would not be profitable, he rejected A&W's offer and proceeded to open the Restaurant.

Based on the entirety of the evidence, the court concludes that Zeidler's claim is deficient and that based on the undisputed facts no reasonable factfinder could conclude that A&W

intended to deceive Zeidler or that Zeidler suffered harm proximately caused by an act of deception committed by A&W.

## IV. Zeidler Does Not State a Claim for Fraud

Counts IV and V of the amended complaint are captioned differently – Count IV is titled Fraud in the Inducement, and Count V is titled Fraud. However, both counts contain similar allegations. By incorporating the allegations asserted in Count III of the amended complaint, Counts IV and V allege that by not disclosing Feltenstein's remarks regarding the profitability of free-standing A&W restaurants, A&W fraudulently induced Zeidler into signing the License Agreement. Both parties have moved for summary judgment on Counts IV and V, and the court addresses these arguments together as a single claim for common law fraud.

A&W argues that these claims should be analyzed as a claim for fraud in the form of intentional concealment of a material fact. According to Illinois law, to prove fraud by intentional concealment of a material fact, a plaintiff must show the existence of a special or fiduciary relationship with the defendant that would give rise to a duty to speak. *See Lewis v. Lead Indus. Associated, Inc.*, 342 Ill. App. 3d 95, 105 (1st Dist. 2003). A&W argues that the franchisor-franchisee relationship is neither special nor fiduciary, and therefore, Zeidler is precluded from proceeding under a theory of common law fraud.

In this case, however, Zeidler does not specify under what theory of fraud he is pursing his claims. The court will not restrict Zeidler, proceeding pro se, to the limited theory of intentional concealment of a material fact. Instead, Zeidler's claim will be analyzed under a generalized theory of common law fraud, which does not require a special or fiduciary relationship to give rise to a duty of disclosure. *See Peter J. Hartmann Co. v. Capital Bank &*

13

*Trust Co.*, 296 Ill. App. 3d 596, 601 (1st Dist. 1998) (fraudulent misrepresentation claims, for example, do not require the articulation of a duty to disclose as an element of the cause of action because such claims are founded on a general moral obligation to speak the truth). Under Illinois law, to prevail in a cause of action for fraud, a plaintiff must prove that (1) the defendant intentionally made a false statement of material fact, (2) the plaintiff had a right to rely on that false statement, (3) the statement was made for the purpose of inducing reliance thereon, (4) the plaintiff in fact relied on the statement, and (5) the plaintiff suffered injury as a direct result. *See Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002).

Zeidler relies on Feltenstein's undisclosed comments at a 2002 investor relations meeting to form the basis of a common law fraud claim. Several facts, each of which is undisputed by Zeidler, doom this claim. First, A&W urged Zeidler not to open the Restaurant and offered to refund all of the money he had invested. Second, the statement made by Feltenstein was delivered nearly six years after Zeidler opened the Restaurant and although it referenced an understanding known at the time Zeidler opened his Restaurant, no statement existed at the time Zeidler entered into the License Agreement with A&W or when he opened the Restaurant. Even if such a statement did exist, A&W explained to Zeidler in no uncertain terms that the Restaurant's location likely would not be profitable. Third, the undisputed facts show that in the three years leading up to the Restaurant's opening, nineteen other free-standing A&W franchises were opened and of those nineteen, seventeen still were in business at the commencement of this lawsuit.

Based on the undisputed facts, Zeidler cannot establish that A&W intentionally made a false statement of material fact. Nor can Zeidler demonstrate that he suffered injury as a result of a false statement made by A&W.

## V. Zeidler's Claim of Fraud in Violation of the Illinois Franchise Disclosure Act Is Not Timely

Zeidler attempts to incorporate a fraud claim under the IFDA in his argument for common law fraud contained within his cross-motion for summary judgment. However, adding a claim at the summary judgment stage "is too late in the day to be adding new claims." *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997).

Zeidler also runs into statute of limitations trouble. The IFDA's statute of limitations provision states:

> No action shall be maintained . . . to enforce any liability created by this Act unless brought before the expiration of three years after the act or transaction constituting the violation upon which it is based, the expiration of one year after the franchisee becomes aware of facts or circumstances reasonably indicating that he may have a claim for relief in respect to conduct governed by this Act, or 90 days after delivery to the franchisee of a written notice disclosing the violation, whichever shall first expire.

815 ILCS 705/27 (2005). The statute of limitations began to run on Zeidler's claim when he signed the License Agreement on July 9, 1996 and expired three years later. Zeidler, however, did not raise this IFDA fraud claim until he filed his motion for summary judgment on December 2, 2005. Consequently, not only is this claim improperly brought well after the pleading stage, it also is untimely.

## CONCLUSION

For the foregoing reasons, A&W's motion for summary judgment [75] is granted, and Zeidler's motion for summary judgment [93] is denied. All pending motions are denied as moot. This is a final and appealable order.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: July 6, 2006